## IN THE UNITED STATES DISTRICT COURT
## FOR THE SOUTHERN DISTRICT OF FLORIDA
### Case No. 9:13-cv-80840-DMM-BRANNON

**EXCELSIOR MEDICAL
CORPORATION,**

      **Plaintiff,**

**vs.**

**IVERA MEDICAL CORPORATION,
ROBERT F. LAKE, JR., and
JEFFREY S. TENNANT,**

      **Defendants and
      Counterclaim Plaintiffs,**

**vs.**

**EXCELSIOR MEDICAL
CORPORATION, COVIDIEN
LP, and COVIDIEN SALES, LLC,**

      **Counterclaim Defendants.**
_____/

### MARKMAN ORDER

THIS CAUSE comes before the Court upon the Parties' *Markman* submissions.
This case was filed by Plaintiff, Excelsior Medical Corporation ("Excelsior) on August 22,
2013.  The Court held a hearing on April 18, 2014, and makes the following
determinations.   In its Complaint, Plaintiff seeks a declaration that its product does not
infringe the Defendants' United States Patent No. 7,282,186 (the "'186 Patent")[1]
Defendants are Ivera Medical Corporation, Robert F. Lake, Jr., and Jeffrey S. Tennant
(collectively, "Ivera").  Excelsior alternatively seeks a declaration that the '186 Patent is
invalid.  In response to Excelsior's Complaint, Ivera filed a Counterclaim which alleges

_____
[1] The '186 Patent is titled, "Decontamination Device." (*See* DE 1-1).

1

that Excelsior, along with Covidien LP and Covidien Sales, LLC, manufacture and sell a product which infringes the '186 Patent.[2] At issue before the Court is the construction of five disputed claim terms in the '186 Patent.[3] For ease of reading, the Court will refer to the Plaintiff/Counterclaim Defendant as Excelsior," and the Defendants/Counterclaim Plaintiffs as "Ivera."

The '186 patent discloses a "Decontamination Device." Excelsior markets a product named "SwabCap," which is concededly a decontamination device.

## I.    LEGAL STANDARD

Claim construction is a question of law for the Court to determine. *Markman v. Westview Instruments, Inc.*, 52 F.3d 967, 979 (Fed. Cir. 1995) (en banc), *aff'd*, 517 U.S. 370 (1996). As a standard matter, the Court will only construe a term when the need arises. "The ordinary meaning of claim language as understood by a person of skill in the art may be readily apparent even to lay judges, and claim construction in such cases involves little more than the application of the widely accepted meaning of commonly understood words." *Phillips v. AWH Corp.*, 415 F.3d 1303, 1314 (Fed. Cir. 2005) (*en banc*) (citing *Brown v. 3M*, 265 F.3d 1349, 1352 (Fed. Cir. 2001)).

When claim construction requires more, "the court should look first to the intrinsic evidence of record, i.e., the patent itself, including the claims, the specification and, if in evidence, the prosecution history." *Interactive Gift Express, Inc. v. Compuserve, Inc.*,

---

[2] Excelsior's product is the "SwabCap," which is a small plastic cap that contains a sponge and 70% isopropyl alcohol. In plain terms the product is screwed onto an intravenous line at the luer activated valve (LAV) to decontaminate it in between uses on an individual patient. The LAV is a port where intravenous injections are inserted for patient administration.

[3] The Parties each filed duplicative initial and responsive briefs which dispute the same five terms.

256 F.3d 1323, 1331 (Fed. Cir. 2001) (quoting *Vitronics Corp. v. Conceptronic, Inc.*, 90 F.3d 1576, 1582 (Fed. Cir.1996)); *see also Medrad, Inc. v. MRI Devices Corp.*, 401 F.3d 1313, 1319 (Fed. Cir. 2005) ("We cannot look at the ordinary meaning of the term . . . in a vacuum. Rather, we must look at the ordinary meaning in the context of the written description and the prosecution history."). "All intrinsic evidence is not equal however." *Interactive Gift Express*, 256 F.3d at 1331.

Within the "intrinsic evidence, courts first look to the words of the claims. *Teleflex, Inc. v. Ficosa N. Am. Corp.*, 299 F.3d. 1313, 1324 (Fed. Cir. 2002); *Vitronics Corp.*, 90 F.3d at 1582. The words of the claims are "generally given their ordinary and customary meaning," which is "the meaning that the term would have to a person of ordinary skill in the art in question at the time of the invention, i.e., as of the effective filing date of the patent application." *Phillips v. AWH Corp.*, 415 F.3d at 1312-1313; *accord InterDigital Commc'ns, LLC v. Int'l Trade Comm'n*, 690 F.3d 1318, 1324 (Fed. Cir. 2012); *Innova/Pure Water, Inc. v. Safari Water Filtration Sys., Inc.*, 381 F.3d 1111, 1116 (Fed. Cir. 2004); *Vitronics*, 90 F.3d at 1582. The ordinary and customary meaning of a claim term may be determined solely by viewing the term within the context of the claim's overall language. *See Phillips*, 415 F.3d at 1314 ("[T]he use of a term within the claim provides a firm basis for construing the term."). Moreover, the use of the term in other claims may provide guidance regarding its proper construction. *Id.* ("Other claims of the patent in question, both asserted and unasserted, can also be valuable sources of enlightenment as to the meaning of a claim term."). Claims should be construed "without reference to the accused device [or product]." *SRI Int'l v. Matsushita Elec. Corp. of Am.*, 775 F.2d 1107, 1118 (Fed. Cir. 1985) (emphasis omitted).

A claim should also be construed in a manner that is consistent with the patent's specification. *See Markman*, 52 F.3d at 979 ("Claims must be read in view of the specification, of which they are a part."). Typically, the specification is the best guide for construing the claims. *See Phillips*, 415 F.3d at 1315; *Vitronics*, 90 F.3d at 1582 ("[T]he specification is always highly relevant to the claim construction analysis. Usually, it is dispositive; it is the single best guide to the meaning of a disputed term."). Precedent forbids, however, a construction of claim terms that imposes limitations not found in the claims or supported by an unambiguous restriction in the specification or prosecution history. *Laitram Corp. v. NEC Corp.*, 163 F.3d 1342, 1347 (Fed. Cir. 1998); *Comark Commc'ns, Inc. v. Harris Corp.*, 156 F.3d 1182, 1186 (Fed. Cir. 1998); *SRI Int'l*, 775 F.2d at 1121.

Another tool to supply proper context for claim construction is the prosecution record and any statements made by the patentee to the United States Patent and Trademark Office ("PTO") regarding the scope of the invention. *See Markman*, 52 F.3d at 980. A patent's prosecution history is designated as part of the "intrinsic evidence" and "consists of the complete record of the proceedings before the PTO and includes the prior art cited during the examination of the patent." *Phillips*, 415 F.3d at 1317 (citation omitted). However, the Federal Circuit has warned that "because the prosecution history represents an ongoing negotiation between the PTO and the applicant, rather than the final product of that negotiation, it often lacks the clarity of the specification and thus is less useful for claim construction purposes." *Id.* "Nonetheless, the prosecution history can often inform the meaning of the claim language by demonstrating how the inventor understood the invention and whether the inventor

limited the invention in the course of prosecution, making the claim scope narrower than it would otherwise be." *Id.*

Along with reviewing the specification, the Court may use the patent prosecution to determine whether the inventor limited the claim scope or disclaimed any particular interpretations. *Vitronics,* 90 F.3d at 1582-83. However, in order to conclude that a patentee narrowed the claim, the disclaimer must have been with "reasonable clarity and deliberateness." *Superguide Corp. v. DirecTV Enters., Inc.*, 358 F.3d 870, 875 (Fed. Cir. 2004) (quoting *N. Telecom Ltd. v. Samsung Elecs. Co.*, 215 F.3d 1281, 1294 (Fed. Cir. 2000)). Thus, unless the patentee makes "clear and unmistakable prosecution arguments limiting the meaning of a claim term in order to overcome a rejection," the patentee is entitled to the full scope of its claim language. *SanDisk Corp. v. Memorex Prods., Inc.*, 415 F.3d 1278, 1286 (Fed. Cir. 2005); *see also Thorner v. Sony Computer Entm't Am. LLC*, 669 F.3d 1362, 1366 (Fed. Cir. 2012).

District courts may also consider "extrinsic evidence," such as dictionaries or technical treatises, to help understand the underlying technology and the manner in which one skilled in the art might use claim terms. *Phillips*, 415 F.3d at 1318. Similarly, expert testimony may aid a court in understanding the underlying technology and determining the particular meaning of a term in the pertinent field, but an expert's conclusory, unsupported assertions as to a term's definition is entirely unhelpful to a court. *Id.* Ultimately, however, "extrinsic evidence" is "less significant than the intrinsic record in determining the legally operative meaning of claim language," *id.* at 1317 (quoting *C.R. Bard, Inc. v. U.S. Surgical Corp.*, 388 F.3d 858, 862 (Fed. Cir. 2004) (internal quotations omitted)), and a court should discount any extrinsic evidence "that is

clearly at odds with the claim construction mandated by the claims themselves, the written description, and the prosecution history, in other words, with the written record of the patent." *Id.* at 1318 (quoting *Key Pharm. v. Hercon Labs. Corp.*, 161 F.3d 709, 716 (Fed. Cir. 1998)).

Once the proper meaning of a term used in a claim has been determined, the term must have the same meaning for all claims in which it appears. *Id.* at 1314 (citations omitted); *Inverness Med. Switzerland GmbH v. Princeton Biomeditech Corp.*, 309 F.3d 1365, 1371 (Fed. Cir. 2002). [A] patentee need not 'describe in the specification every conceivable and possible future embodiment of his invention.'" *CCS Fitness Inc., v. Brunswick Corp.*, 288 F.3d 1359, 1366 (Fed. Cir. 2002).

There is a "heavy presumption that a claim term carries its ordinary and customary meaning." *Johnson Worldwide Ass's, Inc. v. Zebco Corp.*, 175 F.3d 985, 989 (Fed. Cr. 1999). "In order to overcome this heavy presumption in favor of the ordinary meaning . . . , a party wishing to use statements in the written description to confine or otherwise affect a patent's scope must, at the very least, point to a term or terms in the claim with which to draw in those statements." *Id.* In other words, "claim terms cannot be narrowed by reference to the written description or prosecution history unless the language of the claims invites reference to those sources." *Id.* At 989-90.

> "[A] court may constrict the ordinary meaning of a claim term in at least one of four ways. First, the claim term will not receive it's ordinary meaning if the patentee acted as his own lexicographer and clearly set forth a definition of the disputed claim term in either the specification or prosecution history. Second, a claim term will not carry its ordinary meaning if the intrinsic evidence shows that the patentee distinguished that term from prior art on the basis of a particular embodiment, expressly

disclaimed subject matter, or described a particular embodiment as important to the invention. . . . Third, .. . a claim term also will not have its ordinary meaning if the term 'chosen by the patentee so deprive[s] the claim of clarity' as to require resort to the other intrinsic evidence for a definite meaning. Last, as a matter of statutory authority, a claim term will cover nothing more than the corresponding structure or step disclosed in the specification, as well as equivalents thereto, if the patentee phrased the claim in step- or means-plus-function format."

*CCS Fitness*, 288 F.3d at1367.

## II.   ANALYSIS

Ivera is a startup company based in San Diego that sells a medical device called the CUROS® Port Protector ("Curos"). Curos is a disinfecting cap that fits over the inlet port of a medical apparatus called a luer activated valve ("LAV"). LAVs are used by medical staff to introduce fluids into an intravenous (IV) line in a patient in a hospital. Prior to the introduction of Curos, LAVs were typically left uncovered and exposed between each intravenous access.   As a result, LAVs can be a source of bloodstream infections in hospital patients if they are not properly disinfected prior to each access.

Ivera's Curos product is a small plastic cap that contains a sponge and 70% isopropyl alcohol.   Instead of swabbing the access portion of the LAV to disinfect it before each intravenous access, Curos changes the "disinfection paradigm."   As shown below, after each access the nurse simply removes a foil cover and fits a green Curos cap over the inlet port of the LAV (blue) to disinfect and continuously protect the LAV from touch or airborne contamination:



With Curos the LAV is always clean and disinfected.

A.      Overview of the Asserted Patent

The '186 patent was licensed by Ivera from its inventors, Mr. Lake and Mr. Tennant.  Ivera first learned of the '186 patent when it was identified as prior art by Defendant Excelsior in a challenge to the validity of certain Ivera patents on disinfecting caps.  The application that led to the issuance of the '186 patent was filed on June 20, 2003, and the '186 patent issued on October 16, 2007.

The '186 patent discloses and claims a "decontamination device for decontaminating medical apparatus."  Exh. A,  Abstract.  Generally, the invention is a disinfecting cap with a housing that contains a sponge or other dispenser and a decontaminating compound that contacts the medical apparatus when it is placed in the housing.  Id., col. 1, II. 40-48.  The cap also includes a structure for "removably engaging the housing to the medical apparatus."  Id., col. 1, II. 47-48.

This structure may be a "snap-on structure" such as "an elastically deformable, inwardly directed protrusion on the housing which fits around a portion of the medical apparatus when that portion is placed in the housing."  Id., col. 1, II. 47-54.  An example of such a structure is shown in Figures 1 and 2 below, with Fig. 1 showing the device prior to use, and with Fig. 2 showing the device in use with the head of a stethoscope (36) engaged by an "inwardly directed protrusion 44":



FIG. 1        FIG. 2

B.     The Accused Products

Ivera accuses various disinfecting cap products manufactured by Excelsior of

infringing claims 1, 2, 5, 7, 8, and 13 the '186 Patent. The accused products are sold

by Excelsior under its SwabCap® brand and by Covidien under its Kendall® brand,

and include both stand-alone disinfecting caps and disinfecting caps that are

packaged together with or integrated into a "flush syringe."  The stand-alone version

of SwabCap is shown in an example from an Excelsior marketing piece here:



Valve disinfection is a critical part of IV
catheter maintenance and infection prevention.

Let SwabCap® help you:
• Achieve disinfection and protection of needleless connectors
• Standardize disinfection technique and drive compliance to protocol
• Visually monitor and measure compliance
• Save nursing time
• Ensure the aseptic access of needleless connectors, as it is individually packaged and sterile

**Luer Access Valve Cap with
70% IPA as a disinfectant.**
Single Use Only | Sterile Packaging | Luer Lock Design



SwabCap's patent pending thread cover design helps ensure
continuous alcohol bathing of the connector's top and threads

These accused disinfecting caps directly compete with Curos in the market.

See, Exh. B to Hangartner Decl.  All of the accused products attach to the same

medical apparatus as Curos, and are used for the same purpose and function in the

same environments, and include both stand-alone disinfecting caps and disinfecting

caps that are packaged together with or integrated into a "flush syringe."

Turning to the terms that are at issue, as an initial matter, I note that Ivera

claims that "the asserted claims of the '186 Patent are sufficiently clear on their

face [and] that no construction is required." (DE 30-4).  The first three disputed

terms:  (1)  "medical  apparatus";  (2)  "interlocking  structure  for  removably

9

engaging"; and (3) "elastically deformable, inwardly directed protrusion on said housing," each come from Claim "1." of the '186.  The fourth disputed term, "flexible portion," is found in Claim "2." And the last disputed term, "indicia providing information concerning," is found in Claim "7."

These Claims appear as follows, with the disputed terms underlined:

Claim 1.     1. A decontamination device for decontaminating <u>medical apparatus</u>, comprising:
             a housing;
             an absorbent pad carrying a decontaminating compound within said housing;
             and <u>interlocking structure for removably engaging</u> said housing to a portion of said medical apparatus, whereby said absorbent pad is placed into contact with said portion of said medical apparatus upon engagement and removed from contact upon disengagement, said interlocking structure comprising at least one <u>elastically deformable, inwardly directed protrusion</u> on said housing

Claim 2.     2. The decontamination device of claim 1, wherein said housing comprises a <u>flexible portion</u> to facilitate the removable engagement to said medical instrumentation

Claim 7.     7. The decontamination device of claim 1, wherein said housing comprises <u>indicia providing information concerning</u> said decontamination device.

## THE PROPOSED CONSTRUCTIONS

1. "*medical apparatus*"

| Ivera's Proposed Construction | Excelsior's Proposed Construction |
|---|---|
| "medical apparatus" | "medical apparatus that comes into contact with more than one patient and has a contact surface for decontaminating with the decontaminating device" |

As indicated above, Ivera's position is that this term does not require construction. Ivera, however states that any effort to formulate some alternative construction in response to Excelsior's proposed construction did not yield any alternative that did not improperly import limitations from the specification. Ivera's proposed construction, therefore, is the plain language of the claim, which uses the term "medical apparatus" in its ordinary and customary manner. Ivera claims that nothing in the language of the claims limits this term to any particular type of medical apparatus.

Further, Ivera asserts that this construction is strongly supported by the specification, which uses the term "medical apparatus" broadly and in accordance with its ordinary meaning. Relying on the Abstract, Ivera states that it is clear that the claimed "decontamination device can be used with many different medical apparatus." Exh. A, Abstract. Ivera lastly asserts that the patent specification similarly indicates that the "invention is suitable for many different medical apparatus." *Id.*, col. 4, ll. 25-26.

In response, Excelsior asserts that its proposed construction of "medical apparatus" derives from the disclosure of the '186 patent itself. Specifically, Excelsior asserts that the specification lends support to its proposed construction in two notable places. The first is the "Background of the Invention" section of the '186 patent where the problem the alleged invention is intended to address is described. This section identifies the problem the Invention is intended to solve is "the transmission of infectious disease. . . particularly through the use of medical apparatuses." ('186 Patent at col. 1, ll. 16-36). The Inventors state, "[i]t has long

11

been known that medical instruments must be decontaminated, in order to prevent the spread of infectious disease *among different patients with whom the medical apparatus comes in contact.*" (*Id.* at col. 1, ll. 17-21)) (emphasis added).  The Inventors additionally note that "[s]ome medical apparatus, such as stethoscopes, are decontaminated only infrequently." (*Id.* at 1:27-28)).  Accordingly, Excelsior asserts that the '186 patent was intended to address the transmission of infectious disease through the use of shared medical apparatus (for example, a stethoscope) *among different patients.*  According to Excelsior, these statements support its construction of "medical apparatus" as devices that "come[] into contact with more than one patient." *See Trading Technologies Int'l, Inc. v. eSpeed, Inc.*, 595 F.3d 1340, 1353 (Fed. Cir. 2010) (limiting scope of invention where the specification stated that the "the present invention addresses this problem with a one click centering feature").

Consistent with the Background section, the specification also describes "the invention" as "suitable" for "[a]ny medical apparatus which comes into contact with more than one patient and has a contact surface suitable for decontaminating with the decontamination device can be used." (Ex. A ('186 patent) at col. 4, ll. 25-29).  In doing so, the Inventors define "medical apparatus" as devices: (1) used with multiple patients and (2) that have a contact surface to be decontaminated.  That the only medical apparatuses expressly disclosed in the specification – a stethoscope and a defibrillator paddle – meet those two criteria lends further support to this notion. Excelsior's construction thus embraces this definition and provides the same two criteria as the Inventors' definition of "medical apparatus."  *See ASM America, Inc. v. Genus, Inc.,* 401 F.3d 1340, 1343 (Fed. Cir. 2005) (affirming construction that limited

12

claim scope in view of what the specification taught as "suitable" for the invention).

Excelsior asserts that its proposed construction does not introduce limitations from

the specification, but rather, it is interpreting the claim term in a manner consistent

with the specification and how the Inventors' themselves described their own

invention. *See, e.g., ICU Med., Inc. v. Alaris Med. Sys.*, 558 F.3d 1368, 1374-76

(Fed. Cir. 2009).

Excelsior next asserts that the prosecution history of the '186 Patent provides

additional support for its proposed construction. For example, the '186 patent

discloses an attachment device (such as a lanyard), which can be used to connect

the claim decontamination device to the medical apparatus between uses. ('186

patent at col. 3, ll. 66-4:10). When the inventors spoke of this attribute during

prosecution, they stated that "one of the significant advantages of [their] device [] is

that when connected by the lanyard to stethoscope tubing, the decontamination

device can hang from the stethoscope tubing and be ready for use *between patients* .

. . For example, the stethoscope tubing to the ear pieces can be placed around the

doctor's neck *between patients*." (Jun. 29, 2005 Response to Office Action) at 9-10)

(emphasis added). Accordingly, Excelsior asserts that the only reason to have the

lanyard is because the medical apparatus is used with different patients.

In support of its position that I may rely on the specification to limit the scope of

the term "medical apparatus," Excelsior cites to *ASM America, Inc. v. Genus, Inc.*, 401

F.3d 1340 (Fed. Cir. 2005). *ASM America,* however, dealt with claim term that was

specifically defined in the claim specification. In *ASM America*, the term at issue was

"reaction space."  The Federal Circuit held that the following language within the invention's specification, was an express definition:

> the term "reaction space" includes both the space in which the substrate is located and in which the vapor-phase reactions are allowed to react with the substrate in order to grow thin films, namely, the reaction chamber, as well as the gas inflow/outflow channels communicating immediately with the reaction chamber.... According to the invention, the reaction space is the entire volume to be evacuated between two successive vapor-phase pulses.

The language Excelsior relies on here cannot be said to constitute an express definition.  Accordingly, I find that Excelsior's construction is not consistent with the Inventors' own definition, and that the "ordinary meaning of [the] claim language [would be] understood by a person of skill in the art."  The Court will not construe a claim when the meaning or scope of the words is clear.  *See U.S. Surgical Corp. v. Ethicon, Inc.*, 103 F.3d 1554, 1568 (Fed. Cir. 1997). Accordingly, I find that no construction is necessary.

2.   "*interlocking structure for removably engaging*"

| Ivera's **Proposed Construction** | Excelsior's **Proposed Construction** |
|---|---|
| "structure that removably connects by hooking, meshing, overlapping, or fitting together" | "structure that removably locks together or unites in a locked fashion to securely retain" |

As with the term "medical apparatus," Ivera's position is that this term does not require construction as its plain meaning is clear. To the extent that it is construed, Ivera's proposed construction is intended to reflect the ordinary meaning of the words of the claim consistent with the specification. The specification indicates that this term

14

should be given a broad construction, first stating that the "structure for engaging a portion of the medical apparatus can be any suitable structure." '186 patent at col. 3, ll. 33-34. Such a structure "can include cooperating tongue and groove structure, slots, snaps, fasteners, and other engagement structure." *Id.*. at col. 3, ll. 34-36. In the embodiment shown in Figure 2 above, the interlocking structure for removably engaging is described as follows: "an inwardly directed protrusion 44 is formed in the housing 14. The housing 14 has suitable flexibility to permit flexing when the medical apparatus such as a stethoscope head 36 contacts the protrusion 44. The head 36 will then interlock with the housing 14 as shown in FIG. 2."

Thus, as shown in Figure 2, the "interlocking structure for removably engaging" is a structure (44) that removably connects by overlapping and fitting together with the medical apparatus consistent with Ivera's proposed construction. Importantly, the claims are not limited to this specific embodiment,[4] so the construction of this term must allow for a full range of other interlocking structures that removably engage the medical apparatus. According to Ivera, Excelsior's proposed construction improperly imports a further limitation that the engagement "locks together or unites in a locked fashion to securely retain."

I find that the Parties' proposals for this term are unnecessary. As to Plaintiffs' proposal, a person of ordinary skill in the art would understand the terms "interlocking structure for removably engaging." The Court will not construe a claim when the meaning or scope of the words is clear. *See U.S. Surgical Corp. v. Ethicon, Inc.*, 103

---

[4] "There is shown in the drawings embodiments which are presently preferred, it being understood, however, that the invention is not limited to the precise arrangements and instumentalities shown." *Id.* at Col. 2, ll 4-9.

F.3d 1554, 1568 (Fed. Cir. 1997).  Neither Ivera nor Excelsior provide a convincing

reason for changing those words.

Because the Parties' proposed construction would only serve to distort the

ordinary and customary meaning of the disputed term, which is readily apparent, even

to one not of ordinary skill in the art, I find that no construction is necessary.

3.  "*elastically deformable, inwardly directed protrusion on said housing*"

| Ivera's Proposed Construction | Excelsior's Proposed Construction |
|---|---|
| "a flexible structure that extends inward from the housing that substantially returns to its normal shape after it is deformed" | "annular elastically deformable snap-on structure that extends inward over the medical apparatus received in the housing" |

Ivera again asserts that no construction of this term is necessary as its plain

meaning is clear.  To the extent that it is construed, Ivera asserts that its proposed

construction of this term is consistent with the ordinary meaning of the claim

language, and that Excelsior's construction amounts to a  wholesale importation of

limitations from the specification in violation of the most basic principles of claim

construction.

Ivera asserts that the embodiment shown in Figure 2 above shows an

interlocking structure for removably engaging that comprises "an inwardly directed

protrusion 44 is formed in the housing 14."  Thus, the term "inwardly directed

protrusion" is properly understood to refer to a structure that extends inwardly from

the housing of the decontamination device like "inwardly directed protrusion 44."

This protrusion must also be "elastically deformable." This is described in the specification with respect to Figure 2, which indicates that the "housing 14 has suitable flexibility to permit flexing when the medical apparatus such as a stethoscope head 36 contacts the protrusion 44. The head 36 will then interlock with the housing 14 as shown in FIG. 2." By comparing Figure 1 and Figure 2, it is clear that the protrusion 44 in the housing is sufficiently flexible to deform to allow for insertion of the medical apparatus, then return to its normal shape after that deformation.

According to Ivera, this is consistent with the ordinary meaning of the term "elastic," which is commonly understood to mean "able to resume its normal shape spontaneously after contraction, dilatation, or distortion." Exh. C, New Oxford American Dictionary. The term "deformable" is the adjective form of "deform," which means "distort the shape or form of." Id. Thus, an "elastically deformable" structure must be flexible and must "substantially return to its normal shape after it is deformed."

Excelsior counters that Ivera's proposed construction fails to recognize that this protrusion has additional attributes, which are defined in the intrinsic record and recognized by its construction. Specifically, the protrusion must be an annular snap-on structure that extends over the medical apparatus received in the housing because the specification itself indicates that the protrusion is a "snap-on structure."

For example, when describing the "structure for detachably engaging the housing to the medical apparatus," the Inventors provide the example of a "snap-on structure for engaging a portion of the medical apparatus." ('186 Patent) at col. 1, ll. 49-51). And, as an example of such a "snap-on structure," the Inventors describe "a elastically

deformable, inwardly directed protrusion on the housing." (*Id.* at col. 1, ll. 51-54). In other words, in the Inventors' view, while all "snap-on structure[s]" are not "an elastically deformable, inwardly directed protrusion," *all* such "elastically deformable, inwardly directed protrusions" *are indeed* "snap-on structure[s]." It follows, therefore, that when the Inventors claimed "an elastically deformable, inwardly directed protrusion" – the exact language seen in this passage of the specification – they were claiming a snap-on structure.

In further support of its construction, Excelsior points to the Inventors' statements before the BPAI where they stated:

> In claim 3, the structure for detachably engaging the housing to the medical apparatus can be elastically deformable 'snap-on' structure for engaging a portion of the medical apparatus. . . . In claim 4,8 the snap-on structure can be an elastically deformable, inwardly directed protrusion on the housing .
> . .

(Appeal Brief at 3) (citation omitted). Additionally, Excelsior asserts that the Inventors pointed to Figs. 1 and 2 above as depicting such "elastically deformable 'snap-on' structure." (*Id.*)

Ivera states that Excelsior's proposed construction is overly broad because it does not reflect the requirement of an inwardly directed projection on the housing, and at the same time it is overly narrow because it imposes the requirement that such structure be "annular" and limited to a "snap-on structure that extends inward over the medical apparatus received in the housing."

As I found with the terms "medical apparatus" and "interlocking structure for removably engaging," there is not sufficient support for either the broadening or narrowing aspects of Excelsior's proposed construction. Rather I find that the intrinsic

record establishes that the "snap-on" discussion Excelsior points to were merely examples, and not clear limitations. Accordingly, I find that Ivera's proposed construction is legally appropriate.

4. "*flexible portion*"

| Ivera's Proposed Construction | Excelsior's Proposed Construction |
|---|---|
| "portion that can bend without breaking" | "a portion of the housing that outwardly yields, which is not the elastically deformable, inwardly directed protrusion" |

As I did previously with the term "interlocking structure for removably engaging," I find that the Parties' proposals for this term are unnecessary. As to Plaintiffs' proposal, a person of ordinary skill in the art would understand the term "flexible portion." The Court will not construe a claim when the meaning or scope of the words is clear. *See U.S. Surgical Corp. v. Ethicon, Inc.*, 103 F.3d 1554, 1568 (Fed. Cir. 1997). I find that Ivera's proposal is a good definition, but that it is unnecessary. Excelsior does not provide a convincing reason for changing those words. The ordinary and customary meaning of the disputed term is readily apparent, even to one not of ordinary skill in the art. Accordingly, I find that no construction is necessary.

5. "*indicia providing information concerning*"

| Ivera's Proposed Construction | Excelsior's Proposed Construction |
|---|---|
| "sign, mark, or other indication of a property or characteristic" | "markings indicating properties or characteristics of" |

Unlike some of the other terms at issue in this case, this term does require some clarification. The Parties constructions are almost identical, and during the

Hearing, they agreed to the following construction, which is simply a restatement of both of their proposed constructions: "markings, signs, or color indicating properties or characteristics of."

In conclusion, it is

**ORDERED and ADJUDGED** that the disputed terms shall have the constructions set forth herein.

**DONE and ORDERED** in Chambers, at West Palm Beach, Florida tis _29_ day of April, 2014.

DONALD M. MIDDLEBROOKS
UNITED STATES DISTRICT JUDGE

20